IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

CENTER FOR BIOLOGICAL
DIVERSITY, ET AL.,

    Plaintiffs,

              v.

NATIONAL MARINE FISHERIES
SERVICE, ET AL.,
    Defendants.

Civil No. 12-1281 (SEC)

**OPINION AND ORDER**

Before the Court is Plaintiffs' motion to "clarify the court's order regarding remand," Docket # 76 – which the Court construes as a motion to enforce its previous remand order. After reviewing the parties' briefs, Dockets ## 84-87, and the applicable law, Plaintiffs' motion is **DENIED.**

**I.    Factual and Procedural Background**

The Center for Biological Diversity, "a non-profit organization that is actively involved in species and habitat protection issues throughout the United States," Docket # 44-4, and related plaintiffs[1] (Plaintiffs) brought this suit under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 706. They challenged the National Marine Fisheries Service (NMFS)[2] Biological Opinion (BiOp) concluding that the incidental take[3] on elkhorn and staghorn coral (collectively, Acropora)—

---

[1] For a description of the other plaintiffs in this case see Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv., 977 F. Supp. 2d 55, 58 n. 1 (D.P.R. 2013), as amended (Oct. 23, 2013).
[2] The federal agency in charge of the management, conservation, and protection of living marine resources within the U.S. Caribbean's Exclusive Economic Zone, NMFS is part of the National Oceanic and Atmospheric Administration (NOAA), and the Department of Commerce, whose Secretary is the other, named defendant in this case. For ease of reference, the Court will collectively refer to the Secretary of Commerce and NMFS—to whom the Secretary has delegated her authority over Acropora—as "Defendants." See, e.g., Animal Welfare Inst. v. Martin, 623 F.3d 19, 26 n. 9 (1st Cir. 2010).
[3] "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct," 16 U.S.C.A. § 1532, in connection with a species listed as threatened or

which are listed a "threatened species" under the Endangered Species Act (ESA), 16 U.S.C. § 1531 et seq.—resulting from continued but reduced fishing levels for parrotfish and surgeonfish in the U.S. Caribbean Reef Fishery would not jeopardize Acropora's continued existence or adversely affect their critical habitat.

In a previous opinion granting in part both parties' cross-motions for summary judgment, this Court recounted the factual and procedural background, and detailed the legal framework governing this dispute. See Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv., 977 F. Supp. 2d 55, 57-69 (D.P.R. 2013), as amended (Oct. 23, 2013). For the sake of brevity, the Court will provide only the background necessary to dispose of the issues pending.

As explained in the opinion, macroalgae competes with Acropora "for space on the reef." Id. at 65. Parrotfish grazes macroalgae thereby augmenting the reef space for Acropora to thrive. In short, because Parrotfish feeds off Acropora's ecological competitor, a take on Parrotfish produces an incidental take on Acropora.

On summary judgment, the Court validated the BiOp's conclusion that the reduced level of fishing would not jeopardize Acropora or adversely modify its critical habitat because it was based on the best available scientific evidence and because it considered the Fishery's cumulative adverse impacts in the context of existing threats to Acropora and their habitat. But the Court remanded the BiOp's Incidental Take Statement (ITS) to NMFS because its terms and conditions failed to include a meaningful trigger for reinitiating consultation as mandated by the regulatory framework of the ESA. 50 C.F.R § 402.14. On this point, the Court deferred to NMFS's explanation regarding the impracticality of setting a numerical take, but held that its chosen surrogate—monitoring the biomass of unspecified herbivorous fish—was too vague and broad. Therefore, the ITS did not provide a viable method to detect the Fishery's future effect. Specifically, the surrogate was inadequate because NMFS

---

endangered under the ESA. "Incidental take refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02.

did not have current baseline estimates of herbivorous fish biomass and thus, there were no measures against which future measurements could be compared with. Further, measuring undifferentiated herbivorous fish biomass could not account for the fact that larger grazing fish—such as parrotfish—are needed to regulate macroalgae growth. The surrogate thus could not accurately measure the level of allowable take on Acropora. In short, because NMFS could not measure its chosen surrogate, and because the ITS failed to articulate a causal link between the surrogate and the take on Acropora, there was no meaningful trigger for reinitiating section 7 consultation.

After several procedural nuances, the Court entered judgment closing the case administratively, without prejudice, "pending the filing of the Revised Incidental Take Statement." Docket # 74. NMFS then filed a Revised ITS stating that it had completed censuses of parrotfish biomass around the St. Croix and St. Thomas/St. John areas, and that Puerto Rico would be surveyed in 2014. Docket # 75-1 at 6. Also, instead of measuring undifferentiated herbivorous fish, the Revised ITS used the biomass and length of ten specific parrotfish species and particular parrotfish grazing groups as the surrogate or proxy to measure the Fishery's incidental take on Acropora. Id. at 5.

Partially unsatisfied with the Revised ITS, Plaintiffs filed a "motion to re-open this case and clarify the court's order regarding remand." Docket # 76. This time, Plaintiffs challenged the Revised ITS on a very narrow issue: that its terms and conditions do not include monitoring requirements in St. Thomas/St. Johns and Puerto Rico.[4] They argue that this omission violates the ESA.

---

[4] Defendants brought a procedural challenge arguing that, in its previous opinion, the Court did not and could not compel Defendants to issue a Revised ITS that specifically included monitoring requirements at the three locations. Docket # 79 at 3. According to Defendants, Plaintiffs admit as much and it is precisely for that reason that they styled their motion as a "motion to 'clarify' rather than a motion to enforce an existing order." Id. at 5. But because Plaintiffs admitted that despite its style, in their motion they "are asking the Court to enforce its order remanding the original ITS," Docket # 82 at 2, the Court construed Plaintiff's "motion to clarify" as a motion to enforce its previous remand order and instructed the parties to file simultaneous briefs on whether Defendants' failure to require monitoring at Puerto Rico and St. Thomas/St. John violates the ESA and the Court's Order. See Docket # 83. See also The Fund for Animals v. Norton, 390 F. Supp. 2d 12, 15 (D.D.C. 2005) ("District courts clearly have the authority to enforce the terms of their mandates").

The issue of whether monitoring is required in all places where incidental take occurs was initially raised at the summary-judgment stage. There, Defendants argued that given its limited funding levels, NMFS elected to monitor biomass in St. Croix because parrotfish are not strongly targeted in Puerto Rico or in St. Thomas/St. John. Therefore, the reduced level of fishing in these areas was less likely to "significantly change stock size." Ctr. for Biological Diversity, 977 F. Supp. 2d at 90. On this point, the Court stated that

> [a]t first blush, and given the deference owed to NMFS, these explanations appear to be reasonable. But Plaintiffs rightly point to NMFS's admission that the Fishery will continue to degrade Acropora habitat in Puerto Rico and St. Thomas/St. John, and that this continued habitat degradation will result in incidental take throughout all three island areas. That NMFS admitted that such take will occur would normally result in the agency having to monitor that take. **Still, given Defendants' explanations, this shortcoming, without more, should not result in the ITS's invalidation. But when added together to the other flaws discussed above, it tips the scale in favor of Plaintiffs**.

Id. (emphasis added) (internal quotations and citations omitted).

Plaintiffs now contend that by failing to include monitoring requirements in Puerto Rico and St. Thomas/St. John, the Revised ITS violates the Court's order. But Plaintiffs misconstrue the Court's remarks. Concededly, this was one of several deficiencies in the original ITS that contributed to the Court's decision to remand. But now that the Revised ITS cured the other deficiencies, the Court must decide whether this factor in isolation is sufficient to invalidate the Revised ITS under the ESA as a matter of law.

## II.     Standard of Review

A court may set aside an agency action only when the administrative record shows that the agency decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Massachusetts v. U.S. Nuclear Regulatory Comm'n, 708 F.3d 63, 73 (1st Cir. 2013). "An agency decision

fails to pass this test if the administrative record reveals that 'the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise.'" Atieh v. Riordan, 727 F.3d 73, 76 (1st Cir. 2013) (quoting Assoc'd Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997)).

Because the APA standard affords great deference to agency decision making and because the Secretary's action is presumed valid, judicial review… is narrow." Lovgren v. Locke, 701 F.3d 5, 20 (1st Cir. 2012) (quoting Assoc'd Fisheries of Me., 127 F.3d at 107). These principles retain considerable bite where, as here, the action impugned falls within the agency's technical and scientific expertise. See, e.g., Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 377–78, (1989). Barring, of course, violation of federal law, policy choices are the agency's providence, so "even if a reviewing court disagrees with the agency's conclusions, it cannot substitute its judgment for that of the agency." Assoc'd Fisheries of Me., 127 F.3d 104 at 109.

### III.    Applicable Law and Analysis

Under ESA regulations, an ITS must set forth the impact of the incidental take on the listed species, specify reasonable and prudent measures necessary or appropriate to minimize such impact, and set forth terms and conditions—including reporting requirements to implement those reasonable and prudent measures. 50 C.F.R. § 402.14 (i). The ITS must also set "a clear standard for determining when the level of anticipated take has been exceeded." Id. That is, it must "set forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, [thus] invalidating the safe harbor provision, and requiring the parties to re-initiate consultation." Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt., 273 F.3d 1229, 1249 (9th Cir. 2001). The agency must also monitor the incidental take to ensure that the trigger has not been met. "If during the course of the action, the amount or extent of incidental taking…is exceeded, [NMFS] must reinitiate consultation immediately."

50 C.F.R. § 402.14(i)(4). See also id., § 402.16 (listing all circumstances when agencies must reinitiate consultation).

Ideally, the trigger should be a specific number of take from the species. See Ariz. Cattle Growers, 273 F.3d at 1249; accord, e.g., Miccosukee Tribe of Indians of Fla., 566 F.3d at 1274-75. However, the agency may use a surrogate if the ITS "[d]escribes the causal link between the surrogate and take on the listed species." 50 C.F.R. § 402.14 (i)(1)(i); see also Ariz. Cattle Growers, 273 F.3d at 1250 ("[T]he use of ecological conditions as a surrogate for defining the amount or extent of incidental take is reasonable so long as these conditions are linked to the take on a protected species.") (quotation marks omitted).

In their opening brief, Plaintiffs argued that the ESA and its regulations[5] require NMFS to monitor incidental take "in every location where take occurs" to know if and when an unacceptable level of incidental take has been reached. Docket # 85 at 4. In their reply, they added that NMFS's chosen proxy is inadequate because St. Croix is not representative of Puerto Rico and St. Thomas/St. John. Docket # 87 at 9. The Court addresses both arguments *seriatim*.

As to their first argument, Plaintiffs do not marshal any authority in support of their contention that NMFS must monitor incidental take "in every location where take occurs." Docket # 85 at 4. They cite 50 C.F.R. § 402.14 (i) generally, but fail to specify which subsection mandates the federal agency to "monitor incidental take—in every location where takes occurs." The Court was unable to find any. In their reply, Plaintiffs clarified that "[f]ar from asking this Court to order NMFS to look at 'every precise location' where the Fishery is expected to take corals, Plaintiffs are asking that NMFS not be allowed to completely ignore more than 90% of the area where take will occur." Docket # 87 at 7. While this argument has superficial appeal—especially

---

[5] The ESA itself does not contemplate reinitiated consultation. That is required by 50 C.F.R. §§ 402.14(i)(4) & 402.16; see also Catherine E. Kanatas & Maxwell C. Smith, Reexamining What We Stand to Lose: A Look at Reinitiated Consultation Under the Endangered Species Act, 32 Pace Envtl. L. Rev. 225, 228-29 (2015) ("Despite its central role, Congress never provided for reinitiated consultation within the Act itself.").

considering that Defendants do not seem to contest this fact—Plaintiffs do not proffer any authority to support this suggestion that ESA regulations establish a minimum area that must be monitored to ensure regulatory compliance.[6]

NMFS argues that it may reasonably use the results in St. Croix as a proxy for Puerto Rico and St. Thomas/St. John. Given the statutory and regulatory silence regarding the extent of monitoring required in terms of locations where incidental take occurs, the Court must defer to the agency's interpretation of these provisions and may interfere with the agency's construction only if it is unreasonable. See Biodiversity Legal Found. v. Babbitt, 146 F.3d 1249, 1253 (10th Cir. 1998) ("A challenge to an agency construction of a statutory provision must fail if, in light of Congress'[] ambiguity or silence, the agency's action 'is a reasonable choice'"); see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 866 (1984) ("When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case, federal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do"). The issue thus turns on whether NMFS's use of St. Croix as a proxy for the Puerto Rico and St. Thomas/St. John areas is reasonable.

---

[6] As noted in the previous Opinion, although jeopardy to the species and adverse modification of its critical habitat are overlapping yet distinct concepts under the ESA, see Ctr. for Biological Diversity, 977 F. Supp. 2d at 61, the parties' briefs discuss both aspects jointly. Id. at 70. This may be of particular importance here since Puerto Rico, St. Thomas/St. John, and St. Croix were designated as three specific and separate critical habitat areas, see 50 C.F.R. § 226.216 ("Critical habitat is designated for both elkhorn and staghorn coral as described in this section… [It] includes one specific area of the Atlantic Ocean offshore of… Florida, and three specific areas of the Atlantic Ocean and Caribbean Sea offshore of the U.S. Territories of Puerto Rico and the U.S. Virgin Islands. The boundaries of each specific area are described below") (emphasis added). Whether this designation as three distinct critical habitats bears any legal consequence on NMFS's obligations under the ESA was not discussed by Plaintiffs. The Court thus makes no determination on this regard. In any case, any argument based on this theory is deemed waived. See Abdallah v. Bain Capital LLC, 752 F.3d 114, 120 (1st Cir. 2014) ("'[Plaintiff's] 'perfunctory treatment,' of the issue, 'as well as [them] raising this argument for the first time on appeal, waives' it.") (internal citations omitted).

As noted above, federal agencies, when appropriate, may use a surrogate instead of a numerical limit to determine "when the level of anticipated take has been exceeded." 50 C.F.R. § 402.12 (i)(1)(i).  On this point, courts have allowed certain flexibility to federal agencies. Under the "proxy on proxy" approach, for instance, agencies may "use habitat as a proxy to measure a species' population, and then […] use that species' population as a proxy for the population of other species." Lands Council v. McNair, 629 F.3d 1070, 1081, (9th Cir. 2010). See also Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv., 378 F.3d 1059, 1077, n. 4 (9th Cir.) amended sub nom. Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv., 387 F.3d 968 (9th Cir. 2004) (Endorsing the "proxy on proxy" approach in the context of the ESA noting that "[i]f the modeling approach was reasonable in ensuring an accurate population estimate of a species for N[ational] F[orest] M[anagement] A[ct] purposes, it follows that a similar modeling approach to estimate species population for ESA purposes is permissible"). "The test for whether the…proxy is permissible in this case is whether it 'reasonably ensures' that the proxy results mirror reality." Id. at 1066.

While NMFS does not employ the traditional "proxy on proxy" approach per se,[7] it uses a very similar method. NMFS employs two proxies—a proxy for species and another for location. The first one measures the biomass of 10 different types of parrotfish species as a proxy for the incidental take on Acropora. An increase in parrotfish biomass means that parrotfish are grazing more macroalgae, thereby reducing incidental take on Acropora. The second measures the incidental take on parrotfish around St. Croix, as a proxy for the incidental take on parrotfish in Puerto Rico and St. Thomas/St. John. An increase or decrease of parrotfish biomass in St. Croix means that the same should be happening in Puerto Rico and St. Thomas/St. John. Taken together, the trigger is met if parrotfish populations do not show an

---

[7] The difference in this case is that NMFS does not measure habitat as a proxy for a species' population as the first measure of the "proxy on proxy approach" does. Rather, it uses a species' population as a surrogate for another species in a specific location, and then uses the trigger in that location as a proxy of the trigger in other locations.

increase around St. Croix. In that case, NMFS will have to reinitiate consultation as to the three designated areas. Here, Plaintiffs challenge only the second surrogate, arguing that it is inadequate because parrotfish populations in St. Croix are not representative of parrotfish populations in Puerto Rico and St. Thomas/St. John.

Contrary to Plaintiffs' claim, the Revised ITS states that "parrotfish abundance and productivity per unit area in St. Croix are likely representative of the entire U.S. Caribbean." Docket # 75-1 at 6. In support of this necessary assumption, NMFS points out that there are "geographic, biological, and ecological similarities… among all the islands in the U.S. Caribbean." Id. The Revised ITS explains that NMFS chose St. Croix as a proxy, as opposed to Puerto Rico or St. Thomas/St. John, for two reasons. First, St. Croix's relative isolation to the other islands "reduces the likelihood of parrotfish populations from those islands replenishing harvested animals in St. Croix," Docket # 75-1 at 6, and increases the ability to detect changes in parrotfish biomass. Id. The second reason is that St. Croix is more sensitive to the proposed action relative to Puerto Rico and St. Thomas/St. John. This is so because, historically, the harvest of parrotfish has been significantly greater in St. Croix than in the other islands. In addition, "[t]he proposed action reduced parrotfish harvest by [the] greatest amount in St. Croix." Id.  Its sensitivity to the proposed action relative to the other areas makes it easier for NMFS to detect changes in parrotfish population in St. Croix than in Puerto Rico or St. Thomas/St. John. If St. Croix is actually representative of the other areas, a positive change in St. Croix should mean that there is a positive change in Puerto Rico and St. Thomas/St. John. In contrast, the reduced sensitivity of the other two platforms makes it less likely for NMFS to "immediately detect changes in abundance in response to reduced harvest," id., in those areas.

As noted above, its relative isolation is one of the reasons Defendants chose St. Croix as a proxy on the first place. To Plaintiffs, this only proves that the Agency's decision is arbitrary. They posit that "because biomass of parrotfish around St. Croix is not influenced by the biomass of parrotfish around Puerto Rico and St. Thomas/St.

John…[b]y definition, neither population is necessarily representative of the other." Docket # 87 at 8. (emphasis added). The flaw in Plaintiffs' logic is that they mistakenly conflate the meaning of the words "influence" and "representativeness." "Influence" means to "have an effect on the condition or development," Webster's Third New International Dictionary, 1160 (1976), while in this context, "representativeness" means "the characteristic of a scientific experiment that makes it an adequate sample of the general case." Id. at 1927. NMFS chose to use St. Croix as proxy precisely because parrotfish biomass there is less likely to be influenced by the biomass in the other areas. On the other hand, the "geographic, biological, and ecological similarities…among all the islands," Docket # 75-1 at 6, makes St. Croix an adequate sample and therefore representative of the U.S. Caribbean.[8] The Court finds that these explanations provide the required "causal link between the surrogate and take on the listed species." 50 C.F.R. § 402.14.

      Because Plaintiffs do not challenge the similarities between the three island platforms and because of the highly deferential standard owed to the agency under the APA, see Associated Fisheries of Maine,127 F.3d at 109 ("Even if a reviewing court disagrees with the agency's conclusions, it cannot substitute its judgment for that of the agency"), the Court finds that Defendants' inference that St. Croix is representative of the other island platforms is reasonable. This is particularly appropriate here, where

---

[8] Plaintiffs maintain that their argument that St. Croix is not representative of the U.S. Caribbean is reinforced, see Docket # 87 at 8, by NMFS's statement that the "relatively lower harvests of parrotfish from St. Thomas/St. John and Puerto Rico are unlikely to have substantially reduced parrotfish populations there, making it less likely that [NMFS] could immediately detect changes in abundance in response to reduced harvest," Docket # 75-1 at 6. According to Plaintiffs, this is an admission that "monitoring parrotfish at St. Croix will not provide any indication of what is happening in the reefs surrounding the rest of the U.S. Caribbean." Docket # 87 at 8. But as noted, St. Croix's sensitivity is one of the reasons why NMFS chose that location as a proxy in the first place. Whether St. Croix is too sensitive to the proposed action relative to the other areas to be representative of the U.S. Caribbean has not been directly addressed by Plaintiffs nor have they proffered any evidence on record to support this potential argument. Accordingly, any argument on this basis is waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

the agency is "evaluating scientific data within its technical expertise." City of Waukesha v. EPA, 320 F.3d 228, 247 (D.C. Cir. 2003).

Plaintiffs' attempt to analogize this case with Wild Fish Conservancy v. Salazar, 628 F.3d 513 (9th Cir. 2010), also misses the mark. In that case, the agency had established separate numerical limits on two different types of takes on bull trout resulting from the operation of a fish hatchery, but included monitoring and reporting requirements for only one of them. See Id. at 531. According to Plaintiffs, this case is analogous because "NMFS has established a basic threshold for incidental take for all parts of the parrotfish fishery but has only established a trigger for reinitiating consultation for one component of it—the component operating off St. Croix." Docket # 85 at 11.

Two considerations undermine Plaintiffs' analogy. First, Salazar involved two different types of take—the bull trout injured by the water intake and the hatchery's effect in preventing migratory bull trout from reaching the spawning area. In contrast, the issue here involves one type of take—the taking of Acropora because of parrotfish overfishing—occurring at three different locations. Second, in Salazar the agency had selected a numerical value as the trigger, but failed to include monitoring requirements. In rejecting the Fishery's argument that the ITS was adequate because it provided a clear numerical cap on take, the court said that because "a numerical cap is useful insofar as the action agency is capable of quantifying take to determine when the trigger has been met," 628 F.3d at 532, the agency had to "either specify monitoring and reporting requirements with respect to the twenty-bull trout limit or, if appropriate, select a surrogate trigger that can be monitored." Id. (emphasis added). Here, in contrast, NMFS did include monitoring requirements for the taking of Acropora by overfishing, but it chose one location as a proxy for the others. This distinction is material because Salazar does not foreclose the possibility that monitoring the results of an agency action in a particular location may be used as a proxy for other locations in order to establish a trigger.

### IV. Conclusion

In the past, this Court has not hesitated to do "'everything in its power' to ensure compliance with environmental laws." Ctr. for Biological Diversity, 977 F. Supp. 2d at 91 (quoting Water Quality Prot. Coal. v. Municipality of Arecibo, 858 F.Supp.2d 203, 213 (D.P.R. 2012)). "The protection of [endangered species] deserves nothing less." Id. Accordingly, the Court's sympathy lies with Plaintiffs who stand up for important but often neglected issues—like protecting Acropora. But sympathy alone cannot carry the day. While the Court finds some of Plaintiffs' arguments are not without force—particularly the fact that monitoring in St. Croix accounts only for less than 10% of the action area—they did not offer any legal authority to support their theory that the ESA requires NMFS to monitor incidental take "in every location where take occurs." Neither were they able to prove that St. Croix is not representative of, and therefore an inadequate proxy for the rest of the U.S. Caribbean. After carefully reviewing the parties' briefs, given Defendants explanations and the deference owed to the agency, the Court cannot say that NMFS decision to use St. Croix as a proxy in this context was arbitrary.

Finally, the Court notes that subsequent to the publication of the Revised ITS, NMFS listed five additional Caribbean coral species as "threatened" under the ESA and "reinitiated consultation regarding the potential impacts from the continuation of fisheries…on all listed coral species, including elkhorn and staghorn coral." Docket # 8 at 1-2. Thus, regardless of this decision, NMFS is already reevaluating the BiOp and Revised ITS in light of the newly listed species of corals.

For the reasons stated above, Plaintiffs' motion to enforce is **DENIED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 5th day of February, 2016.

> *s/ Salvador E. Casellas*
> SALVADOR E. CASELLAS
> U.S. Senior District Judge